844 So.2d 970 (2003)
STATE of Louisiana
v.
George LEE.
No. 2002-KA-1793.
Court of Appeal of Louisiana, Fourth Circuit.
April 2, 2003.
*974 Harry F. Connick, District Attorney, Donna R. Andrieu, Assistant District Attorney, New Orleans, LA, for Plaintiff/Appellee.
Sherry Watters, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
(Court composed of Judge CHARLES R. JONES, Judge DENNIS R. BAGNERIS SR., and Judge MICHAEL E. KIRBY).
DENNIS R. BAGNERIS SR., Judge.
STATEMENT OF THE CASE
Defendant George Lee was originally charged on November 19, 1999 in case #410-779 with two counts of sexual battery, two counts of extortion and three counts of second degree kidnapping. Some counts were severed. Defendant was tried and acquitted on one count of extortion, and a mistrial was declared as to one count of sexual battery and two counts of kidnapping, after the jury was unable to reach verdicts on those counts. Trial was reset and, on February 24, 2000, the State nolle prosequied the charges.
On the same date, February 24, 2000, in case # 412-994, the State reinstituted the remaining charges and added more, charging defendant with six counts of forcible rape and four counts of second degree kidnapping. The court severed some of the counts. In State v. Lee, XXXX-XXXX, unpub. (La.App. 4 Cir. 3/31/00), writ denied, XXXX-XXXX (La.4/3/00), 759 So.2d 78, this court granted the State's writ, reversing the judgment of the trial court and ordering all counts tried together. On April 3, 2000, at the start of trial, the trial court denied another motion to sever filed by defendant. In State v. Lee, XXXX-XXXX, unpub. (La.App. 4 Cir. 4/3/00), this court denied defendant's application for supervisory review of that decision. On April 5, 2000, the trial court declared a mistrial, finding that the State had concealed Brady material. The State applied for supervisory review. In State v. Lee, XXXX-XXXX (La.App. 4 Cir. 5/8/00), 767 So.2d 97, this court vacated the trial court's order that the State turn over its entire file to the defense. This court further remanded the case with instructions pertaining to the State's obligation to provide defendant with Brady materialincluding requiring the trial court, on motion of the State, to review evidence in camera to determine whether the defense was entitled to it. On May 18, 2000, the State nolle prosequied the charges in case # 412-994.
On the same date, May 18, 2000, in case # 414-519, the instant case, the State charged defendant with seven counts of forcible rape, violations of La. R.S. 14:42.1, and five counts of second degree kidnapping, violations of La. R.S. 14:44.1. Defendant pleaded not guilty at his May 19, 2000 arraignment. The trial court denied defendant's motion to suppress the identification on May 25, 2000. On June 13, 2000, *975 the court ordered the State to turn over all tapes in its possession. The State applied to this court for supervisory review. In State v. Lee, XXXX-XXXX, unpub. (La.App. 4 Cir. 8/29/00), this court ordered the court to conduct an in camera inspection of the tapes, with only the ones containing Brady material to be turned over to the defense. On November 30, 2000, the State filed a motion to invoke the firearm sentencing provision.[1]
Trial commenced on October 18, 2000, but a mistrial was declared on October 25, 2000 on motion of defendant, after a police witness withdrew two napkins from a pocket in a pair of defendant's uniform pants that had been introduced in evidence. At that time the trial court also granted defendant's motion to suppress the napkins and, on its own motion, found Assistant District Attorney Lionel "Lon" Burns in contempt. The State sought supervisory review of the contempt matter. In State v. Lee, 2000-2357, unpub. (La. App. 4 Cir. 10/31/00), this court granted the State's writ application, vacating the finding of contempt on a procedural error and remanding the case. This court denied the State's writ application as to the suppression of the napkins in State v. Lee, 2000-2429 (La.App. 4 Cir. 1/4/01), 778 So.2d 656, writ denied, XXXX-XXXX (La.1/8/01), 778 So.2d 1147.
On November 17, 2000, the trial court denied ADA Lon Burns' motion to recuse himself, and again found Mr. Burns in contempt. In State v. Lee, 2000-2510, unpub. (La.App. 4 Cir. 11/17/00), this court denied Mr. Burns' writ application as to the trial court's denial of his motion to recuse.
On January 9, 2001, the trial court denied defendant's motion to quash based on double jeopardy due to ADA Lon Burns' misconduct. The trial court also denied defendant's motion for a stay order. This court denied defendant's subsequent application for supervisory writs as to the denial of his motion for stay in State v. Lee, XXXX-XXXX, unpub. (La.App. 4 Cir. 1/17/01), writ denied, XXXX-XXXX (La.1/19/01), 781 So.2d 565.
On January 25, 2001, the trial court conducted a lunacy hearing, finding defendant competent to proceed. Trial commenced on February 7, 2001 and, on February 10, 2001, a twelve-person jury found defendant guilty as charged as to counts five through twelvefive counts of forcible rape and three counts of second degree kidnapping. On Tuesday, March 13, 2001, the trial court denied defendant's motion for new trial and sentenced him to thirty years on count five; ten years on count six; thirty years on count seven; ten years on count eight; thirty years on count nine; ten years on count ten; twenty-five years on count eleven; and five years on count twelve, all sentences at hard labor and without benefit of probation, parole or suspension of sentence. In addition, the trial court sentenced defendant to two years at hard labor, without benefit of probation, parole or suspension of sentence, under La.C.Cr.P. art. 893.3(A), for possessing a firearm at the time he committed the crime or crimes. All sentences were to run concurrently.[2] Defendant now appeals.
*976 FACTS
New Orleans Police Detective Sheryl Matthews investigated the rape of T.C. in August 1999.[3] A police officer named "C. or G. Lee" was developed as a suspect T.C. described the uniform and a name tag with G. or C. Lee on it. The detective took T.C. to the Public Integrity Division ("PID"), because the alleged perpetrator was a police officer. Marvin Pepp was with T.C. when they were accosted by Officer Lee. Crime lab personnel collected some napkins at the scene of the crime.
Det. Ronald Ray, assigned to PID, investigated the case because a police officer was involved. Det. Ray identified the scene of the alleged attack as along Wisner Blvd., near Filmore Avenue, on the bayou. T.C. described the police officer perpetrator as a black male, approximately five feet seven inches tall, twenty-eight to thirty-two years old. Det. Ray said at the time there were only six New Orleans police officers with the last name Lee. An Officer Lee with a first initial of C. was eliminated as a suspect because he was white. Only one other officer had a first initial similar to C. or G., defendant George Lee. T.C. identified defendant in a photo lineup shown to her by Det. Ray. Mr. Pepp was unable to make an identification; he said he had not seen the face of the attacker. Det. Ray secured search warrants for defendant's person, for defendant's unmarked police vehicle, for his mother's residence and for defendant's residence. Det. Ray identified numerous items seized during the searches, including a man's plain gold wedding band and a baby seat seized from the rear seat of Officer Lee's unmarked police car. T.C. had described her attacker as wearing a plain wedding band on his left hand, and Marvin Pepp stated that he was handcuffed and secured in the backseat of a vehicle next to a baby seat. Three condoms were seized from a shotgun case in defendant's vehicle.
Det. Ray took a taped statement from defendant. The tape was played for the jury. Defendant claimed to have had consensual sex with T.C. in a driveway not very far from City Park. Officer Lee mentioned napkins in his statement. No napkins were found at the location where Officer Lee said the sexual relations occurred, but napkins were found at the location where T.C. said the assault occurred. Those napkins tested negative for sperm, and therefore no DNA testing was conducted.
New Orleans Police Sergeant James Gallager, supervisor of computer operations with the police department, identified a computer printout showing that defendant had accessed the criminal history of Marvin Pepp during the period of January 24, 2000 through February 1, 2000. Sgt. Gallager admitted on cross-examination that every New Orleans police officer has access to the criminal history database.
*977 Monet McCullam, with Swifty Car Rental, testified that it leased defendant's unmarked Chevrolet Cavalier to the New Orleans Police Department.
Felicia Moran testified that she worked as a cashier at the Winn-Dixie supermarket on North Carrollton Avenue from 11:00 p.m. to 6:00 a.m. on the night of August 22-23, 1999. Defendant worked a security detail at the store that night wearing a regular New Orleans Police Department uniform. She recalled seeing defendant at approximately midnight. He told her he had sex with a "freak" on the bayou, and that he had to give her three hundred dollars. Ms. Moran happened to know T.C. through Gail Cotton, a fellow Winn-Dixie employee who was present when defendant made the above remarks. Several days later, Ms. Moran was talking to Ms. Cotton, who put T.C. on the phone. T.C. was crying and stuttering.
Gail Cotton essentially confirmed Ms. Moran's testimony. She claimed defendant said that the night before he "had a freak" on Wisner Blvd. T.C. was the best friend of Ms. Cotton's aunt. Ms. Cotton had known T.C. for approximately ten years, and had never known her to date defendant. Ms. Cotton admitted on cross-examination that she believed defendant was talking about having consensual sex. She knew that there supposedly was a three hundred dollar price that was involved.
Wanda Cotton testified that T.C. had been her best friend for some sixteen years, since the sixth grade. T.C. usually picked Wanda Cotton up from work. She got off work at 12:00 a.m. on August 22, 1999, but T.C. never came or answered her page. T.C. telephoned her at approximately 2:00 a.m. from the police station, crying.
Marvin Pepp, a self-employed auto mechanic, testified that on the night in question T.C. was giving him a ride to retrieve his car from the parking lot of a lakefront restaurant. As they drove up Wisner Blvd., the engine light came on. They pulled over, and Mr. Pepp got out to look under the hood. Defendant approached and asked him if he was wanted, and for identification. Mr. Pepp said he recognized defendant, who had graduated from the police academy with his cousin. He told defendant he knew him, and defendant replied that no, he did not. Defendant handcuffed him and walked him to a car hidden behind some bushes about fifty feet away. A van was parked behind the car, and defendant ran off the van. Defendant told Mr. Pepp that he had a warrant out for him, that he was going to jail, and that he was going to call a cruiser to get T.C. Defendant went back to T.C.'s car, returning about fifteen minutes later. He was nervous and sweating, and was fixing his pants and "stuff" (his gun belt). Defendant said something about chasing someone, and that he had to take that person to jail. Defendant unlocked the handcuffs on Mr. Pepp and told him to walk away and not turn around. Defendant's car had a baby seat in it. Mr. Pepp said he thought defendant's name tag read "C. Lee." Afterward, T.C. drove to Mc-Donald's to pick up her friend, Wanda Cotton, who was not there when they arrived. Mr. Pepp said he did not identify defendant's photograph in the photo lineup presented to him by police, although he recognized him, because he wanted to talk to his attorney first. However, he identified defendant in court. Mr. Pepp admitted on cross-examination that police told him he was a suspect in a kidnapping. This was the reason he told police he was not identifying anyone in defendant's photo lineup and that he wanted to talk to an attorney.
*978 Sgt. Ronald Ray was recalled as a witness. He identified a tape recording of a second statement given by defendant. The tape was played for the jury. Defendant was arrested on August 24, 1999, the day after he gave his second statement. Sgt. Ray testified that D.W. gave him information about a rape that occurred at N. Claiborne and Montegut Street.[4] D.W. also made a second allegation of rape that occurred on Old Gentilly Road. Sgt. Ray recorded her statement. D.W. identified defendant in a photo lineup as the person who raped her on October 4, 1999. She related that defendant picked her up the first time at Louisa and N. Dorgenois Streets, and took her to a location under the bridge at N. Claiborne and Montegut where he raped her. The second time she was picked up on Chef Menteur Highway and Warren Street and taken to Old Gentilly Road, where she was raped.
Sgt. Ray admitted on cross-examination that he did not take D.W. in for a medical examination, and that to his knowledge she never underwent one. D.W. allegedly saw defendant's photograph on television. D.W. said defendant used the name Ronnie Williams when he raped her.
Zachary Turrell, who appeared as a witness with both his hands and feet shackled, admitted that he was serving a sentence on a conviction for possession of crack cocaine, his first conviction. D.W. was close to him and his family. She worked for his mother. Mr. Turrell worked for his mother also, as a maintenance person for her health care business on Chef Menteur Highway. In the summer of 1999, he saw D.W. enter a vehicle on Chef Menteur Highway. He had seen the vehicle, a new car, pass by twice before, and warned D.W. not to get in. It was occupied by one male. Mr. Turrell said he saw D.W. an hour or so later, walking down the street crying and in a disheveled state. He took her to his mother's business and gave her a shirt to wear. D.W. told him the man in the car had raped her. Mr. Turrell identified photographs of the area on Chef Menteur Highway. Mr. Turrell admitted on cross-examination that he knew D.W. was a prostitute.
Sgt. Ronald Ray, recalled as a witness, testified that he received an anonymous telephone call on September 28, 1999. The caller telephoned several more times before he was able to convince her to reveal her identity, U.H. Sgt. Ray first met with U.H. in January 2000. She gave him defendant's name, and in February 2000 identified him in a photo lineup as the person who raped her. That same day, Thomas Emory Jr., who was with U.H. when accosted by defendant, also identified defendant in a photo lineup. Sgt. Ray was never able to pinpoint the location of the rape, only the general area of Wisner and Filmore. He explained that U.H. was from St. Louis and that she was not familiar with the area.
Sgt. Ray admitted that he had no knowledge of any medical reports indicating that U.H. had undergone a sexual assault examination. U.H told the officer that she believed she bled onto the seat of the car in which she was raped. However, Sgt. Ray said that by the time she actually came in, the vehicle had been returned to the rental car company. Therefore, the vehicle was never tested for traces of U.H.'s blood.
Frank Larre testified that U.H. and her boyfriend, Thomas Emory, came to his office in October 1999. Mr. Larre, a criminal defense attorney, witnessed U.H. and Mr. Emory select defendant's photo from police photo lineups. He also assisted *979 U.H. in the filing of a civil lawsuit against defendant and the City of New Orleans.
Sergeant Howard Gay, assigned to PID, received a complaint from C.P. that defendant raped her in March 1999 at South Peters and Orange Streets, near the Mississippi River.C.P. made the complaint after being released from jail. Sgt. Gay later learned that C.P. had some convictions for prostitution. She gave a description of a black male weighing approximately two hundred and twenty pounds with a medium Afro hairstyle who identified himself as a police officer by flashing his badge. C.P. indicated that her attacker used a condom in a blue package. A small piece of blue packaging was recovered at the scene, and Sgt. Gay identified a crime lab photograph of it. C.P. indicated that she saw the perpetrator again when he came to her apartment on Oretha Castle Haley Blvd., at which time she screamed, fearing he was going to assault her again. On that day defendant was wearing a New Orleans Police department task force uniform, i.e., military-type pants with pockets on the side, and a blue shirt with a police emblem on the top and the officer's name on the shirt"C. Lee." Raymond Brown, the landlord for C.P.'s apartment building, identified defendant from a photo lineup as the person he had observed in the alleyway/driveway of the apartment building. C.P. also identified defendant's photo from a photo lineup.
Sgt. Gay said on cross-examination that he recalled that C.P. had heard defendant's name. He also recalled that she had described her attacker's vehicle as dark green or black. A tape recording of Raymond Brown's statement was played for the jury, and Sgt. Gay conceded that on the tape Mr. Brown said he weighed two hundred and sixty pounds, and that the officer he observed in the alleyway/driveway of C.P.'s apartment building was bigger than himself. With regard to the suspect's car, Sgt. Gay said on redirect examination that C.P. described it as a green two-door sports-type car with tinted windows. Sgt. Gay said defendant owned a green two-door Lexus with slightly tinted windows.
Thomas Emory Jr. testified that around midnight on July 22, 1999, he and U.H. drove to the bayou in his vehicle. Defendant approached their car with a flashlight and asked Mr. Emory to step out of his car. He asked Mr. Emory if he had any drugs, guns or paraphernalia. He told Mr. Emory to stand by a nearby tree, and ordered U.H. out of the vehicle. Mr. Emory said defendant was wearing a motorcycle patrol uniform, and was carrying his gun. Defendant came back over to Mr. Emory, and told him there was an attachment out on U.H., and he had to call a female officer to pick her up. Defendant walked back over to U.H., then returned and told Mr. Emory that he was going to work it out. He directed Mr. Emory to go up the street and pop the hood. Defendant said that when the female officer arrived, he would tell her that it was a misunderstanding, and let them go. Twenty minutes later, defendant dropped off U.H. where Mr. Emory was waiting. She was crying when she entered the car. Mr. Emory asked her what happened, but she said only that she wanted to go home. Once inside Mr. Emory's home, U.H went into the bathroom. Mr. Emory said he could "hear water," presumably meaning that he heard water running. U.H. finally told him that defendant had sexually assaulted her. U.H. eventually decided to go to police. Mr. Emory secured counsel, because he was wary of all police officers. The three of them met with Sgt. Ray and an assistant district attorney. Mr. Emory identified defendant's photo in the lineup. Mr. Emory said in cross-examination that U.H. was a female entertainer, that she *980 danced. He was not a party to U.H.'s civil suit against defendant and the City of New Orleans.
T.C., then twenty-seven years old, testified that on August 22, 1999, she and Marvin Pepp were driving to Jaeger's restaurant about 10:00 or 11:00 p.m., where Mr. Pepp had parked his car. Her car, a 1989 Ford Escort, began making a funny noise. They pulled over on Wisner Blvd., across from City Park, so Mr. Pepp could inspect it. Mr. Pepp was outside the car and she was inside when defendant walked up with a flashlight and asked what they were doing. Defendant asked them both for identification, and asked if they had ever been arrested. Defendant ordered her out, after ordering Mr. Pepp to the back of the car, and told her to keep her hands on the hood of her car. Defendant was in a police uniform, carrying his gun. Defendant walked Mr. Pepp toward the bayou. When defendant returned, he announced to T.C. that Mr. Pepp had an outstanding arrest warrant. Defendant started telling T.C. how fine and pretty she was, and asking her what her husband would say if he knew she was out there. Defendant asked her what kind of panties she was wearing. She told him bikinis. He asked to see, and then lifted up her dress. She still had her hands on the hood of the car. He exclaimed that she was "fine," and started felling her buttocks and moved his hand to rub around her vagina. He asked her what she would do to keep from going to jail. He unzipped his pants, pulled her panties to the side, and inserted his penis into her. He took off his gun belt at one point and put it on the top of the car. He pointed his flashlight toward the direction where T.C. had seen some headlights minutes before. Then he ordered her into the car and raped her again on the back seat. When defendant expressed an interest in anally penetrating T.C., she said the only thing she wanted him to do was to get off of her. He got off of her and she got out of the car. He made her stand by the car, and he ejaculated on the ground.
Defendant subsequently told her that she could be with him, that he would take care of her. He said he would bring her three hundred dollars the next day. She thought he was crazy, but asked him his name. He said his name was William Smith. Defendant gathered up his gun belt and said he was going to let Mr. Pepp go. When Mr. Pepp returned and asked whether defendant had done anything to her, she would not tell him, fearing that the unarmed Mr. Pepp would go after the armed defendant. They drove away and she finally told Mr. Pepp what happened. She drove to pick up her friend Wanda at McDonald's, but she had already gone. They drove to Mr. Pepp's mother's home, and then all three went to the police station. She reported the crime, and Det. Matthews took her to the hospital for an examination. She identified defendant in court as the man who raped her, and recounted her identification of him in the photo lineup. T.C. recalled telling Wanda Cotton what happened, and she also talked to Felicia Moran and Gail Cotton.
D.W., who admitted three prior convictions, two for prostitution and one for drugs, testified that defendant raped her twice. The first time was in June 1999. She was using drugs with a friend, Tony, at his residence in the 2400 block of Louisa Street. She later left and was walking toward N. Galvez Street when defendant drove up and offered her a ride in a dark blue or purple Crown Victoria-type of vehicle. D.W. accepted, saying she needed a ride to eastern New Orleans. Defendant drove toward N. Claiborne Avenue. Out of habit as a prostitute, she asked him if he was a police officer. He countered by asking her if he looked like a police officer.
*981 He asked her if she dated, which D.W. interpreted to mean as a prostitute. She said she sometimes did. He said he had twenty dollars and asked what she would do for that. She said either oral or intercourse. He gave her a twenty-dollar bill. He pulled over underneath the N. Claiborne Avenue overpass. He exited the car, came around to her door, and told her to stand up. When she stood up, he grabbed the twenty-dollar bill out of her hand and put an NOPD star and crescent badge in her face. The badge was in a black wallet. She said he had what looked like a police radio and a gun on his side. She asked his name, and he said it was Ronnie Williams. She said he had her, and that he would to take her to jail. He said he was not going to take her to jail but that she was going to do what he wanted her to do.
Defendant told D.W. to lie across the seat, and she complied. He undid his pants and had vaginal intercourse with her. While doing so, he asked her if she ever had anal sex. She said no, that she did not do that, and begged him not to do that to her. She said later in her testimony that he did rape her anally on this occasion, and that he ejaculated in her rectum. Defendant left the scene after the rape, warning her not to tell anyone. D.W. identified photographs of her friend Tony's residence and the location where the rape occurred.
D.W. was leaving her aunt's nursing home on Chef Menteur Hwy. at 10:00 p.m. on the night of the second rape when defendant picked her up. She was with her cousin Zachary Turrell. They were talking about getting high. D.W. said she would go home to get some money or prostitute herself to get some money. Defendant drove by in an Explorer, and D.W. said to Mr. Turrell that she thought she had a prostitution date. Mr. Turrell vainly implored her not to go. D.W. entered the vehicle anyway. Defendant asked where she was headed. She said she was going toward Winn-Dixie. A short while after entering the vehicle, D.W. asked him if she knew him. He said no, that he was not from here. After looking at defendant, particularly noting his bad skin, D.W. told him that she remembered who he was. She told him that he was the one who liked anal sex. Defendant replied that it was about to happen again. There was never any discussion about money. D.W. noted that defendant did not immediately recognize her, but then recognized her hand, which was somewhat deformed. D.W. said he was going to have to kill her, that she was not going to be assaulted again. D.W. said defendant was holding his gun, which was on his side, and threatened that he could get her. Defendant drove her to Old Gentilly Road, in front of a junk yard. At this point he had the gun in his hand, in his lap. Defendant raped her anally, using a condom. Before letting her out of the car after the second rape, defendant offered D.W. forty dollars. She said that for what he did to her it should be one hundred dollars. Defendant then dropped D.W. off back at her aunt's nursing home. She told Mr. Turrell that there was a man out there pretending to be a police officer. She went to Mr. Turrell's apartment and took a shower. She telephoned Sgt. Ray the next day. D.W. testified later that it was almost a week or so before she went to police.
D.W. said that her sister was the first person she told about the first rape. Her sister had since died. She did not tell police earlier because she felt that, being a prostitute, no one would believe her. She decided to report the rapes after she saw defendant's picture on the evening news. She identified defendant in court as the person who raped her. She went to PID on October 4, 1999 and identified defendant's *982 photograph in a lineup. D.W. conceded that she was arrested on a cocaine charge after coming forward. She conceded that she entered into an agreement with the State whereby it would drop the charges in consideration of her testifying truthfully in the instant case. D.W. said she had systemic lupus and was taking medication that affected her memory. However, she had not been taking this medication at the time of the rapes.
D.W. admitted on cross-examination that she understood she could have been charged as a habitual offender on the cocaine charge and would have faced mandatory jail time. She said she would have gone forward and testified anyway. She confirmed on cross-examination that she had previously said that the State of Louisiana was on the badge defendant displayed to her on the occasion of the first rape. D.W. said that at the time of that rape defendant put his radio on top of the car, not his gun. She was confronted with her prior testimony wherein she testified that defendant put his "weapon" on top of the car. D.W. was also confronted with her prior testimony wherein she stated that after the first rape defendant dropped her off where he picked her up. However, she maintained that she walked away from the rapeback to her friend Tony's residence on Louisa Street. D.W. admitted that she and her cousin Zachary Turrell smoked crack cocaine after the second rape. D.W. admitted that one of her friends had a brother that was a New Orleans Police Officer, and that she did not contact that friend about the rape.
C.P. testified that she was raped during the early morning hours of March 28, 1999. She was sitting and talking with a friend in the friend's parked car on Terpsichore Street, between Baronne and Carondelet Streets. Defendant, in street clothes, approached and flashed a badge. C.P.'s friend got out and went to the back of the car, where he had a conversation with defendant. Defendant ordered C.P. out of the car and into his nearby car, a green two-door car with dark-tinted windows. He drove to South Peters, near Glazer Steel. On the way, defendant told her he had been watching her "big fine ass." He ordered her to pull her pants down and lean out the driver's side window. Then he raped her anally, wearing a blue condom. She said she hollered and screamed. She asked him to stop several times. He told her that if she could not stand it, she did not have any business "being out there." He finished, threw away the condom, and cleaned up with a paper towel, which he also threw away. He subsequently dropped her off at South Liberty Street and Martin Luther King Blvd. C.P. admitted that she had engaged in prostitution. However, she replied in the negative when asked if this had been a "date." C.P. said that after the assault she could not control her bowels, and had to change her underwear. C.P. identified photos of defendant's personal car, the two-door green Lexus with tinted windows.
C.P. testified that a couple of months later she saw defendant at her apartment. She was with a "date." Defendant knocked and entered when C.P. answered her door. He threw her date against a wall. Defendant was wearing a uniform with dark blue pants with big pockets. She did not report the rape to police until after she was taken to jail for public drunkenness. She saw defendant on television, accused of rape, and she decided to come forward. She met with someone from the District Attorney's office after she got out of jail. She identified defendant in a photo lineup on September 3, 1999. C.P. admitted prior convictions for illegal use of a credit card and drugs. She had been arrested for prostitution but never convicted. *983 C.P. reiterated on cross-examination that the car in the photographs introduced in evidence was the car she was in. She was then confronted with her prior testimony that she was not going to say she remembered the vehicle because she was too busy looking at defendant's face. She explained that as time went on she recalled the vehicle. C.P. confirmed on redirect examination she had testified on May 25, 2000 that her attacker's car was a green two-door with tinted windows. She also said she had been able to give Sgt. Ray a description of the vehicle.
Alan Greenstone, an assistant district attorney for Orleans Parish, testified that C.P. had never been arraigned on a pending charge of possession of cocaine, and never been offered a deal as to the charge. Mr. Greenstone said on cross examination that C.P. was described in her file as a career criminal, and as a third offender would be facing a mandatory forty months in prison. C.P. was arrested on the charge December 7, 2000.
U.H., then residing in St. Louis, Missouri, testified that on July 22, 1999, she and Thomas Emory went to a daiquiri shop and then to the bayou. She was visiting New Orleans, and was not then nor at trial familiar with New Orleans streets. Defendant approached their car with a flashlight, wearing a police uniform. Defendant separated the two, moving Mr. Emory over to some trees, keeping her at the car. He asked her for identification and questioned her. He went over to Mr. Emory, and returned to tell U.H. there was a warrant out for her arrest. U.H. knew she had an outstanding warrant from St. Louis. Defendant mentioned something about money, and U.H. thought he might be shaking her down. So she offered him a hundred dollars. He did not take it. U.H said the next thing she knew, Mr. Emory entered his car and drove away. Defendant told her that they were going to work it out, and said something about a female officer who was supposed to come on the scene and drive her down to where Mr. Emory was waiting with the hood of his car up.
U.H. said she saw the motion of defendant putting on a condom. He opened the passenger side door and ordered her to bend over and pull down her shorts. She complied, because she thought he was going to hurt her. By that time she had begun to doubt that he was a police officer. Defendant penetrated her vagina. U.H. said she was starting her period and consequently knew she left blood on the seat. Afterward, defendant dropped her off where Mr. Emory was waiting. U.H. at first hesitated to tell Mr. Emory what happened, fearing he would try to do something to defendant. She told him after defendant drove out of sight. U.H said defendant was driving a dark burgundy Cavalier. She did not call police that night because she thought no one would believe her.
U.H. moved back home the next week because she did not feel safe, and did not return until September. Upon her return, she viewed a news report about a police officer raping a woman, causing her to feel a little guilty about not reporting her rape. She contacted police and was referred to Sgt. Ray. However, she was reluctant to reveal her identity, and did not do so for another two weeks. She was afraid to talk to police alone, fearing police would blame her or make her out as a bad person because she was a dancer. So, Mr. Emory contacted an attorney, Frank Larre, to accompany them to a meeting with police. She identified defendant's photo in a lineup on February 18, 2000. She identified him in court as the man who raped her. U.H. said that on the night of the rape she had consumed only a few sips of her daiquiri *984 before defendant confronted her and Mr. Emory. U.H. admitted filing the civil suit.
U.H. admitted on cross examination that she initially told Sgt. Ray that defendant, who she presumably had seen on television, looked like the man who raped her. She also suggested to Sgt. Ray that the car be checked for her blood. Sgt. Ray informed her that to do anything like this she would have to come in and make a complaint so he could secure a search warrant. U.H said she had a medical checkup five days after the assault, but did recall whether she told Sgt. Ray what medical facility she went to. She could not recall the name of the facility, but recalled that she had gone to the emergency room.
Sgt. Howard Gay was recalled as a witness by defendant. He confirmed that he took a statement from Officer Melvin Williams on October 11, 1999. C.P. alleged that she told Officer Williams that she had been raped by a New Orleans police officer. Officer Williams said C.P. had not made any statements regarding defendant.
George Bourgeois, an assistant district attorney assigned to the screening division, identified a screening action form for Raymond Brown, who had been arrested for armed robbery on December 26, 2000. Mr. Bourgeois made the decision to refuse the charge, and it was officially refused on February 5, 2001. Raymond Brown's arrest register reflects that he was a career criminal. Mr. Bourgeois said he did not learn that Raymond Brown was a potential witness against defendant until after he refused the charge against Mr. Brown, and that he learned it from Raymond Brown himself.
New Orleans Police Officer Raymond Burkhart arrested Claster Williams in October 1998, and confiscated a State of Louisiana-issued private investigator's photo identification card and gold-colored, star-pointed badge with a Louisiana state seal for private investigators. Claster Williams was arrested for reckless operation of a motor vehicle and disregarding a red light. Officer Burkhart confirmed that his own New Orleans police badge did not say State of Louisiana.
New Orleans Police Detective Easterlyn McKendall testified that in August 1999 he investigated a sexual complaint lodged against a social worker named Bruce Baker. Mr. Baker had once been a reserve New Orleans police officer, and had also been a Louisiana State Police Trooper. Det. McKendall said that as a reserve New Orleans police officer, Mr. Baker would have had a badge and New Orleans Police Department equipment, including a uniform.
Marvin Pepp was recalled as a witness by defendant, and examined as to some discrepancies in his trial testimony and the statement he gave to Sgt. Ray.
Sgt. Ray, recalled as a witness by defendant, testified that U.H. asked him whether he was handling the other cases involving allegations against defendant. He confirmed that U.H. suggested that he check the vehicle for traces of her blood, and admitted that he never did so. Sgt. Ray admitted that he is heard on the tape during U.H.'s statement saying that in light of the other cases they had against defendant, it was not hard to believe he was also the one who raped her. Sgt. Ray confirmed on cross-examination that his New Orleans police identification has "State of Louisiana" on it. Sgt. Ray confirmed on redirect examination that defendant did not have a Crown Victoria during the period in question. He confirmed that no police motorcycle apparel, boots, etc., was seized from defendant's home. Sgt. Ray again confirmed that the two napkins *985 recovered from the scene of one rape could not be connected to defendant.
Orleans Parish Assistant District Attorney Lionel Burns, called as a witness by defendant, testified that he assisted the lead prosecutor in prosecuting defendant beginning in Spring 1999. He became the lead prosecutor in the second trial of defendant. Defense counsel elicited testimony from Mr. Burns concerning his contempt conviction at one of defendant's earlier trials, relating to his alleged planting of napkins in a pair of defendant's pants that had been collected as evidence.
Sgt. Howard Gay, who previously testified for defendant, was recalled and questioned about Raymond Brown, C.P.'s onetime landlord who allegedly told the sergeant that he had seen defendant in the driveway of C.P.'s apartment building. Sgt. Gay had already testified that Mr. Brown described himself as weighing two hundred sixty pounds and that the officer he saw that day was bigger than himself. Mr. Brown identified defendant's photo in a lineup, and the tape of that identification procedure was played for the jury. Sgt. Gay said Mr. Brown did not indicate at any time that he was unsure of who he had seen.
ERRORS PATENT
A review of the record reveals two errors patent. The record reflects that the trial court failed to wait twenty-four hours between its denial of defendant's motion for new trial and sentencing, as required by La.C.Cr.P. art. 873. However, while the record reflects that defendant did not "explicitly" waive the requirement, there was an implicit waiver when defendant's counsel replied in the affirmative when asked if defendant was ready for sentencing. State v. Pierre, 99-3156, p. 7 (La.App. 4 Cir. 7/25/01), 792 So.2d 899, 903, writ denied, 2001-2828 (La.8/16/02), 822 So.2d 614, writ denied, 2001-2409 (La.9/13/02), 824 So.2d 1189 (implicit waiver where defense counsel responds in the affirmative when trial court inquires if he is ready for sentencing).
As to the second error patent, the trial court illegally imposed a separate two-year sentence on defendant because it implicitly found that defendant had a firearm in his possession at the time of the commission of one of the offenses for which he was convicted. This sentence was purportedly imposed under authority of La.C.Cr.P. art. 893.3(A). However, that provision merely provides for a two-year mandatory minimum sentence for an offense for which defendant has been convicted, not an additional sentence on top of the sentence imposed for the conviction. Accordingly, that two-year sentence must be vacated and the case remanded for resentencing, at which time the court must also designate the particular conviction for which it is imposing the mandatory minimum sentence under La.C.Cr.P. art. 893.3(A). This matter is discussed further in addressing defendant's Assignment of Error No. 4.
ASSIGNMENT OF ERROR NO. 1
In his first assignment of error, defendant argues that the trial court erred in denying defendant's motion to quash based on the ground of double jeopardy, because of prosecutorial misconduct.
In Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), cited by defendant, the court explained that the intent of the prosecutor must be examined to determine whether the double jeopardy clause has been violated because of prosecutorial misconduct:
Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not *986 bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. A defendant's motion for a mistrial constitutes"a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact" United States v. Scott, 437 U.S. 82, 93, 98 S.Ct. 2187, 2195, 57 L.Ed.2d 65 (1978). Where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, "[t]he important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." United States v. Dinitz, supra, 424 U.S., [1075] at 609, 96 S.Ct., [1075] at 1080[, 47 L.Ed.2d 267 (1976)]. Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion. (emphasis added).
456 U.S. at 675-676, 102 S.Ct. at 2089.
The Court further explained it was holding that:
[T]he circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.
Since the Oregon trial court found, and the Oregon Court of Appeals accepted, that the prosecutorial conduct culminating in the termination of the first trial in this case was not so intended by the prosecutor, that is the end of the matter for purposes of the Double Jeopardy Clause of the Fifth Amendment to United States Constitution.
456 U.S. at 679, 102 S.Ct. at 2091.
Three mistrials were granted during the prosecutions of defendant in three different cases. In case #410-779, defendant was tried and acquitted on one count of extortion, and a mistrial was declared as to one count of sexual battery and two counts of kidnapping because the jury was unable to reach verdicts on those counts. As this mistrial was not the result of misconduct on the part of the State, it has no double jeopardy clause implications.
The second mistrial was in case # 412-994.[5] On April 5, 2000, the trial court declared a mistrial on the ground that the State withheld exculpatory evidence, Brady material, from defendant, and ordered the State to turn over its entire file to the defense. This court reversed the trial court's order that the State turn over its entire file to the defense in State v. Lee, XXXX-XXXX (La.App. 4 Cir. 5/8/00), 767 So.2d 97. The State subsequently nolle prosequied the charges in # 412-994. It is obvious that the State's failure to produce any Brady material in case # 412-994 was designed to secure a conviction, not to goad defendant into requesting a mistrial. Therefore, the double jeopardy clause was no bar to the retrial of defendant in this instance.
The third mistrial was granted to defendant in the instant case, # 414-519, after prosecutor Lionel Burns led a police officer witness to pull two napkins from the pocket of defendant's pants, which had been seized as evidence. At a January 9, 2001 hearing on defendant's motion to *987 quash, the trial court specifically referred to its previous finding that, in having the witness pull the napkins out, the prosecutor sought to prejudice defendantin hopes of winning his casebut did not intend to goad the defense into requesting a mistrial. For that reason, the trial court denied defendant's motion to quash on double jeopardy grounds. It is obvious that the prosecutor was simply seeking to convict defendant, not goad defendant into requesting a mistrial. Therefore, first, deferring to the trial court's factual conclusions, as the U.S. Supreme Court did in Oregon v. Kennedy, which factual conclusions are without question correct, the double jeopardy clause was no bar to defendant's retrial in the instant case.
Defendant also asserts that his retrial in the instant case should have been estopped, based on the State's failure to produce the Brady material in case # 412-994, as well as the prosecutor's alleged planting of the napkins in the aforementioned trial in the instant case that was mistriedthe trial court concluded that the prosecutor planted the napkins. Defendant cites no Louisiana case for this proposition of estoppel, and the cases he cites are not applicable to the facts of the instant case.
Defendant also cites this court's decision in State v. Kyles, 97-2660 (La. App. 4 Cir.1998), 706 So.2d 611, for the proposition that fundamental fairness should have barred his fourth trial, the trial in the instant case. In Kyles, the defendant was to be tried for the fifth time on the same charge of first-degree murder for which he had already been tried four times. His first trial ended in a hung jury and mistrial. Later that same year he was retried, convicted, and sentenced to death. Over ten years later, that conviction and death sentence were fireversed by the U.S. Supreme Court. The defendant was retried two more times, with each trial ending in a hung jury and mistrial. The trial court denied the defendant's motion to bar a fifth trial on the ground of fundamental fairnessthe "enough is enough" argument. On review, this court cited La. C.Cr.P. art. 17[6] for the proposition that a court does have the inherent authority to dismiss a prosecution on the basis of fundamental fairness. This court further noted that such a decision is a matter of sound judicial discretion, which decision should not be disturbed absent a gross abuse of discretion. This court noted a number of factors to be considered by the court in deciding the issue:
1) the number of prior mistrials and reasons for them;
2) the character of the prior trials and similarity of evidence presented;
3) the likelihood of any substantially different result at a new trial;
4) the trial court's own evaluation of the strength of the parties' cases;
5) the conduct and diligence of counsels;
6) the seriousness of the offense;
7) the public's concern for the effective and definitive conclusion of criminal prosecutions;
8) the status of the defendant; and
9) the impact of retrial upon the defendant in terms of untoward hardship and unfairness.
97-2660, p. 6, 706 So.2d at 614.
Defendant claims that by the fourth trial in the instant case the character of the *988 trial and the evidence presented disintegrated into rehearsed testimony full of hearsay and inadmissible other crimes and bad acts evidence. Defendant submits that he could not obtain a fair trial in that atmosphere and under those circumstances, and his conviction was inevitable.
There is no merit to defendant's argument. Unlike in Kyles, defendant in the instant case was not tried four times on all of the charges for which he was convicted. Defendant's first trial, in case # 410-779, involved four counts. He was acquitted on one, an extortion count involving T.C., and a mistrial was granted as to one count of forcible rape and one count of second degree kidnapping as to T.C., and one count of second degree kidnapping as to Marvin Pepp. All of these counts, as well as others that had been severed, werenolle prosequied. Prosecution on all but the count involving the kidnapping of Marvin Pepp was reinstituted in case # 412-994, which was mistried after the State failed to turn over Brady evidencea taped statement of a cashier employed by Winn-Dixie that supposedly corroborated defendant's claim that he told her he had consensual sex with a woman on the bayou, as well as a taped statement of Raymond Brown in which he said that the officer who showed up at C.P.'s apartment weighed more than himselfMr. Brown weighed 260 pounds. In case # 414-519, the State reinstituted prosecution on all of the counts from # 412-994, and added one count of forcible rape and one count of second degree kidnapping. Of course, the last trial in this case was mistried after the napkin debacle.
The fundamental fairness/"enough is enough" case for barring a fifth trial in Kyles was considerably stronger than defendant's case here for barring his fourth trial. Kyles was tried on the same count of first degree murder four times with: (1) a hung jury; (2) a conviction which was reversed on a Brady violation after Kyles served over ten years in prison; and (3) & (4) hung juries. There was only one hung jury in defendant's three prior trials, as to three of the eight counts for which defendant was ultimately convicted in the instant case. The State was at fault in the two subsequent mistrials. Defendant's argument is primarily based on these two mistrials. However, in neither of these two trials did the State have the opportunity to fully present its case. Thus, the notion that the State kept trying defendant again and again until it finally was able to obtain convictions based on rehearsed (by repetition) testimony is without merit. Considering all of the factors outlined above, it cannot be said that it was a gross abuse of discretion for the trial court in the instant case to deny defendant's motion to quash his indictment or bar his fourth trial based on the ground of fundamental fairness, the "enough is enough" argument.
There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 2
In his second assignment of error, defendant claims that the evidence was insufficient to support his conviction on count six, for the second degree kidnapping of C.P.; on counts seven and nine, the forcible rapes of D.W.; and on counts eight and ten, the second degree kidnappings of D.W.
This court set out the well-settled standard for reviewing convictions for sufficiency of the evidence in State v. Ragas, 98-0011 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have *989 found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
98-0011 at p. 13-14, 744 So.2d at 106-107, quoting State v. Egana, 97-0318, pp. 5-6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 227-228.
As to the defendant's two convictions for the forcible rape of D.W., counts seven and nine, defendant argues specifically that the State failed to prove that D.W. did not consent to sexual intercourse. Forcible rape is defined by La. R.S. 14:42.1 as follows:
A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
(2) When the victim is incapable of resisting or of understanding the nature of the act by reason of stupor or abnormal condition of the mind produced by a narcotic or anesthetic agent or other controlled dangerous substance administered by the offender and without the knowledge of the victim.
As to count seven, the forcible rape of D.W. in June 1999, defendant submits that it was simply a case of D.W. prostituting herself to defendant but not being paid for it. D.W., who had two convictions for prostitution, testified that defendant picked her up in his car and offered her a twenty-dollar bill for sex. However, when he stopped the car, he exited, came around to her door, and told her to stand up. He then grabbed the twenty-dollar bill out of her hand and put an NOPD star and crescent badge in her face. She said he "had *990 her," meaning for the crime of solicitation for prostitution, and to take her to jail. Defendant said he was not going to take her to jail, but that she was going to do what he wanted her to do. He told her to lie across the seat, and she complied. He undid his pants and had vaginal intercourse with her. He asked her if she ever had anal sex. She said no, that she did not do that, and begged him not to do that to her. She said later in her testimony that he did rape her anally on this occasion, and that he ejaculated in her rectum. Defendant left the scene after the rape, warning her not to tell anyone. D.W. may have been preparing to prostitute herself for twenty dollars. However, when defendant grabbed his twenty dollars back and implicitly threatened her with either harm or jail if she did not submit to him, there was no consent to the sexual assault that followed. Viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that D.W. did not consent to intercourse on this occasion.
Defendant claims that D.W. also prostituted herself on the occasion of the second alleged rape, in late July-early August 1999, when he picked her up on Chef Menteur Hwy. This was count nine. He claims that D.W. testified at an earlier motion hearing that she had anal and vaginal sex with him for forty dollars. However, what D.W. said at that hearing was that after the assault defendant handed her forty dollars. This was consistent with her trial testimony. D.W. admitted that she entered defendant's vehicle on that second occasion intending to prostitute herself to earn money to buy crack cocaine for her and her cousin, Zachary Turrell. However, she recognized defendant after a short period of time, confronted him that he was the person who liked to have anal sex, and told him that it was not going to happen again, that he would have to kill her. She said defendant had his hand on his gun. He drove to a deserted area on Old Gentilly Road and raped her. He later thrust forty dollars at her, and she responded by saying that for what he did to her it should be a hundred. D.W. admitted that afterward she went to Zachary Turrell's apartment and they smoked crack cocaine, the implication being that she bought the cocaine with the forty dollars defendant gave her. Nevertheless, viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that D.W. did not consent to intercourse with defendant on this second occasion either.
Second degree kidnapping is defined by La. R.S. 14:44.1 as follows:
A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
(1) Used as a shield or hostage;
(2) Used to facilitate the commission of a felony or the flight after an attempt to commit or the commission of a felony;
(3) Physically injured or sexually abused;
(4) Imprisoned or kidnapped for seventy-two or more hours, except as provided in R.S. 14:45(A)(4) or (5); or
(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or *991 (3) The imprisoning or forcible secreting of any person.
As to both counts eight and ten, the second degree kidnappings of D.W. in connection with the respective rapes, defendant claims the evidence was insufficient because D.W. was a prostitute who willingly entered defendant's car on each occasion. However, viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant enticed D.W. to enter his car on each occasion under the pretext of arranging a prostitution date, when at the time he did so on each occasion he specifically intended to rape her, and did rape her, both times while armed with a weapon. Thus, the evidence was sufficient to sustain his convictions for these counts of second degree kidnapping.
Count six was the second degree kidnapping of C.P. Once again, defendant submits that C.P. was a prostitute who entered his vehicle willingly in hopes of prostituting herself to defendant. However, C.P. testified that when defendant approached the vehicle in which she was sitting with another individual, defendant ordered her out of the car and into his nearby car. Defendant then drove to South Peters Street, near Glazer Steel. On the way, defendant told her he had been watching her "big fine ass." Once at the location, defendant ordered her to pull her pants down, and he raped her anally. There was no evidence that C.P. willingly entered defendant's car. Viewing all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that defendant forcibly seized C.P. and carried her to a location where he raped her.
There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 3
In this assignment of error, defendant claims the trial court erred in admitting inadmissible evidence of defendant's bad character and other bad acts, setting forth seven instances.
1. Defendant first argues that the trial court erred in admitting evidence as to defendant's shotgun, shotgun case and condoms, which Sgt. Ray testified were found in the trunk of defendant's vehicle during a search thereof. Defendant submits that the trial court had earlier granted his motion in limine to bar evidence of the shotgun. Regardless, while defendant objected to the introduction of the shotgun, case and condoms, he objected on the grounds of relevance, i.e., that it had nothing to do with the case. La.C.Cr.P. art. 841(A) requires that a defendant make known the grounds for his objection, and he is limited on appeal to those grounds articulated at trial. State v. Brooks, 98-0693, p. 9 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 819; see also State v. Dean, XXXX-XXXX, p. 8 (La.App. 4 Cir. 3/14/01), 789 So.2d 602, 607, writ denied, XXXX-XXXX (La.3/15/02), 811 So.2d 897 ("As the defendant's argument on appeal is different from his basis for objecting at trial, the defendant is precluded from raising the issue on appeal."). See also State v. Broaden, 99-2124, pp. 16-17 (La.2/21/01), 780 So.2d 349, 361, cert. denied, Broaden v. Louisiana, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001) (defense objection to testimony as to other crimes and motion for mistrial made after witness left stand and jury removed for lunch was untimely and did not preserve matter for review).
Defendant did not object to the evidence on the ground that it had been ruled inadmissible. Accordingly, he is precluded from arguing that ground of error on appeal. As to relevance, two *992 victims testified that defendant used a condom when assaulting them. Therefore, the fact that condoms were found in his vehicle was relevant. Any evidence as to the shotgun was harmless. State v. Castleberry, 98-1388, p. 23 (La.4/13/99), 758 So.2d 749, 768-769 (an error is harmless if the verdict rendered was surely unattributable to the error). Defendant was a police officer, as defense counsel noted, and would have had those items. There is no reversible error here.
Defendant mentions testimony concerning evidence that he lied to his wife. However, he does not quote such testimony and cites pages in the record that only refer to testimony about the seizure of the shotgun and condoms. Any testimony suggesting that defendant lied to his wife was harmless. That is, the guilty verdicts returned in this case were surely unattributable to any testimony referring to defendant lying to his wife. State v. Castleberry, supra.
2. Defendant next complains that T.C. was permitted to testify that he took money from her to refrain from arresting Marvin Pepp, even though defendant had been acquitted of the charge that he extorted money from T.C. at his first trial, on January 20, 2000. T.C. testified that after defendant confronted her and Mr. Pepp and separated them, he told her that Mr. Pepp was trying to make a deal but had no money. T.C. stated that she thought perhaps all defendant wanted was money, so she offered him twenty dollars. Defendant rhetorically asked if she had twenty dollars, then demanded it from her and put it in his pocket. Defendant objected to this testimony, referring the trial court to a prior discussion, and moved for mistrial, which was denied.
La. C.E. art. 404(B) generally bars introduction of evidence as to other bad acts or crimes, but provides for exceptions, including reference to such acts or crimes "when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding," what is referred to as the res gestae. The Louisiana Supreme Court commented on the res gestae in State v. Brewington, 601 So.2d 656 (La.1992):
This court has approved the admission of other crimes evidence when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it. State v. Boyd, 359 So.2d 931, 942 (La.1978); State v. Clift, 339 So.2d 755, 760 (La. 1976). In such cases, the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. McCormick, Law of Evidence 448 (2d ed.1972). The concomitant other crimes do not affect the accused's character, because they were done, if at all, as parts of a whole; therefore, the trier of fact will attribute all of the criminal conduct to the defendant or none of it. And, because of the close connection in time and location, the defendant is unlikely to be unfairly surprised. 1 Wigmore, Evidence Sec. 218 (3d ed.1940). State v. Haarala, 398 So.2d 1093,1097 (La.1981).
601 So.2d at 657.
T.C.'s testimony with regard to defendant demanding twenty dollars from her constituted an integral part of the act or transaction that was the subject of the proceeding, and was admissible. Defendant cites no authority for the proposition that this res gestae evidence was inadmissible because he was acquitted of a charge of extorting that same twenty dollars from T.C.
*993 3. Defendant next complains that the State was permitted, over his repeated objections, to refer to defendant's termination from the police department. Defendant cites three references. The prosecutor first referred to defendant as an "ex-officer" during voir dire. Defendant objected and moved for a mistrial, which was denied. The matter arose after defense counsel referred to defendant being a police officer, something he apparently had done previously. The prosecutor objected, and said that defense counsel needed to refer to defendant as a former police officer. Defendant cites two more instances where the prosecutor referred to defendant as an "ex-officer" during his opening statement. The prosecutor did not refer in the three cited instances to defendant being terminated as a police officer, only that he was a former officer and an ex-officer. These remarks did not concern other crimes or bad acts; defendant could have voluntarily left the employ of the police department for any number of reasons. There is no merit to this argument.
4. Defendant next complains about testimony and evidence that defendant misused the NCIC computer to investigate Marvin Pepp on dates other than the date of any alleged offense. During a break in the testimony of Sgt. Gallager, defense counsel reurged a motion in limine, pertaining to any testimony concerning these acts by defendant. Defense counsel based his motion on the grounds of relevancy and other crimes/bad acts. The trial court deferred ruling on the matter, stating that it would see where the testimony went, and advising defense counsel to make his objection at the appropriate time, when the court would exclude the testimony if irrelevant. When the time came, defense counsel objected, some ten times, to testimony and documents shown to Sgt. Gallager. However counsel objected only on the ground of relevance. Evidence that defendant used police computers to investigate the background of Marvin Pepp, who was in the company of T.C. when defendant confronted them and raped T.C., was relevant as tending to prove guilty knowledge on defendant's part. Defendant failed to preserve for review the issue of whether the references were to bad acts or other crimes.
5. Defendant next points to testimony by Felicia Moran and Gail Cotton, both employees at the N. Carrollton Ave. Winn-Dixie where defendant worked a paid detail during the period he allegedly raped T.C. They testified as to comments made by defendant on the night after he allegedly raped T.C. For example, Ms. Moran testified that defendant said something about having sex that night with a "freak" on the bayou. Defendant did not lodge an objection as to this statement, except that the question asked by the prosecutor was leading. Defendant objected to Ms. Moran illustrating sexual motions defendant made, but stated no ground. An objection stating no basis presents nothing for review. State v. Richards, 99-0067, p. 4 (La.9/17/99), 750 So.2d 940, 942.
Defense counsel objected on the ground of relevancy when Ms. Moran was asked whether defendant discussed having sex at any other locations in the city, and she replied that he had sex on West End Boulevard, on the bayou near John F. Kennedy High School, and City Park. Defendant's motion for mistrial was denied. The rapes of two victims occurred on the bayou, which is essentially at the edge of City Park, and both locations were not too far from Kennedy High School. Thus, these were inculpatory admissions on the part of defendant that were relevant. As to the testimony about defendant's *994 comment about West End Blvd., that street is not very far from the locations of the rapes. In addition, one of the rapes on the bayou was near Wisner Blvd. It is possible Ms. Moran mistakenly recalled defendant say West End Blvd., when in fact it was Wisner Blvd. It cannot be said that the West End Blvd. comment made it impossible for defendant to obtain a fair trial. Therefore, the trial court properly denied defendant's motion for mistrial. See La.C.Cr.P. art;. 775 (mistrial where prejudicial conduct in or outside of courtroom makes it impossible for defendant to obtain a fair trial).
Gail Cotton followed her fellow Winn-Dixie employee Felicia Moran as a witness. When she referred to defendant as a pervert, defense counsel objected and the trial court sustained the objection. She subsequently testified that defendant told her he would go up to cars on Wisner Blvd. and look into them with a flashlight. Defense counsel objected that the State was attempting to bring in "other stuff," and moved for a mistrial. The trial court implicitly sustained the objection but denied the motion for mistrial when it directed the prosecutor to move on without ruling on defendant's motion for mistrial. It cannot be said that this comment about defendant's actions with the flashlight made it impossible for him to obtain a fair trial. Also, the defense knew the substance of these women's testimony, and was not prejudiced by any surprise or lack of notice. Therefore, the trial court properly denied the motion for mistrial. See La.C.Cr.P. art. 775. Additionally, the guilty verdicts rendered in this case were surely unattributable to any error here, and thus any such error was harmless. State v. Castleberry, supra (an error is harmless if the verdict rendered was surely unattributable to the error).
6. Defendant next complains about testimony by Officer Gay and victim C.P. concerning the incident when defendant went to C.P.'s apartment and accosted one of her prostitution dates. However, the record reflects no objection by defendant to testimony by Officer Gay or C.P. as to the defendant appearing at her apartment several months after the rape, except for some objections to the prosecutor's leading of the witnesses. There were no defense objections to the testimony of either witness on the ground of inadmissible references to other bad acts or crimes. Accordingly, this claim of error was not preserved for review. Broaden v. State, supra (defense objection to testimony as to other crimes and motion for mistrial made after witness left stand and jury removed for lunch was untimely and did not preserve matter for review).
7. Defendant next argues that the prosecutor repeatedly attacked defendant's character and used the above-mentioned acts to label him as a pervert and a menace. Defendant objected and moved for a mistrial after these references.
The scope of closing argument "shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant." La.C.Cr.P. art. 774. However, prosecutors have wide latitude in choosing closing argument tactics. State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, citing State v. Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments that referred to "smoke screen" tactics and defense as "commie pinkos" inarticulate but not improper). Further, the trial judge has broad discretion in *995 controlling the scope of closing arguments. Id. Even if the prosecutor exceeds the bounds of proper argument, a reviewing court will not reverse a conviction unless "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. State v. Ricard, 98-2278, p. 4 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 397. Even where the prosecutor's statements are improper, credit should be accorded to the good sense and fairmindedness of the jurors who have heard the evidence. Ricard; supra.
Crediting the good sense and fairmindedness of the jurors in this case who heard the evidence, it cannot be said that the prosecution's references to defendant as a pervert and a menace leaves one thoroughly convinced that the argument influenced the jury and contributed to the verdict. Accordingly, there is no reversible error here. The trial court properly denied the motions for mistrial made on these grounds.
Lastly, defendant claims that the trial court committed reversible error in failing to charge the jury that other crimes evidence serves a limited purpose and that a defendant cannot be convicted for any crime other than the one charged with, or one responsive thereto. The record reflects that there were no objections to the trial court's instructions to the jury. Accordingly, defendant failed to preserve this issue for review. La.C.Cr.P. art. 801(C) ("A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error."); State v. Martin, 98-1507, p. 16 (La.App. 4 Cir. 4/5/00), 788 So.2d 1, 11 (citing La.C.Cr.P. art. 801). See also La.C.Cr.P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.")
There is no reversible error as to any of the claims set forth in this assignment of error.
ASSIGNMENT OF ERROR NO. 4
In his final assignment of error, defendant claims that the firearm sentencing provision in La.C.Cr.P. art. 893.1 et seq. is unconstitutional in that it deprives him of his due process right to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. As noted in the Errors Patent discussion, the two-year additional sentence imposed under La. C.Cr.P. art. 893.3(A) because the court found defendant possessed a firearm during the commission of one crime for which he was convicted must be vacated and the case remanded for resentencing. Thus, this assignment of error is moot. However, because on remand defendant may be resentenced under La.C.Cr.P. art. 893.3, defendant's constitutional claim will be addressed.
The Louisiana Supreme Court set forth the general rules applicable to review of the constitutionality of a state statute in State v. Palermo, 2000-2488 (La.5/31/02), 818 So.2d 745, as follows:
Generally, statutes are presumed constitutional, and any doubt is to be resolved in the statute's favor. State v. Brenner, 486 So.2d 101, 103 (La.1986); Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515, 520 (La.1983). Louisiana criminal statutes must be "given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." La. R.S. 14:3. In construing statutes, courts must endeavor to give an interpretation that will give them effectiveness and purpose, *996 meaningless. State v. Union Tank Car rather than one which makes them meaningless. State v. Union Tank Car Co., 439 So.2d 377, 381-82 (La.1983). The party challenging the constitutionality of a statute bears a heavy burden in proving that statute to be unconstitutional. State v. Brooks, 541 So.2d 801, 811 (La.1989); State v. Griffin, 495 So.2d 1306,1308 (La.1986).
2000-2488, p. 5, 818 So.2d at 749.
Under La.C.Cr.P. art. 893.3, on motion of the district attorney, the trial court may find by clear and convincing evidence that the defendant possessed, used and/or discharged a firearm in the commission of the felony or specifically enumerated misdemeanor for which he was convicted, and/or caused bodily injury by using and/or discharging the weapon. A finding of one of those violations mandates that the court impose a mandatory minimum sentence for the crime for which the defendant has been convicted.
La.C.Cr.P. art. 893.1 states:
A. If the district attorney intends to move for imposition of sentence under the provisions of Article 893.3, he shall file a motion within a reasonable period of time prior to commencement of trial of the felony or specifically enumerated misdemeanor in which the firearm was used.
B. The motion shall contain a plain, concise, and definite written statement of the essential facts constituting the basis for the motion and shall specify the provisions of this Chapter under which the district attorney intends to proceed.
La.C.Cr.P. art. 893.2 states:
A. If a motion was filed by the state in compliance with Article 893.1, the court may conduct a contradictory hearing following conviction to determine whether a firearm was discharged, or used during the commission of the felony or specifically enumerated misdemeanor, or actually possessed during the commission of a felony which is a crime of violence as defined by R.S. 14:2(13), felony theft, production, manufacturing, distribution, dispensing, or possession with intent to produce, manufacture, distribute, or dispense a controlled dangerous substance in violation of the Uniform Controlled Dangerous Substances Law, or specifically enumerated misdemeanor and whether the mandatory minimum sentencing provisions of Article 893.3 have been shown to be applicable.
B. The court may consider any evidence introduced at the trial on the merits, at defendant's guilty plea, or at the hearing of any motion filed in the case. The court may also consider any other relevant evidence presented by either party at the contradictory hearing. The hearsay rule shall not be applicable at such contradictory hearings.
C. The burden shall be upon the state to establish by clear and convincing evidence that the defendant actually discharged, used, or actually possessed a firearm during the commission of the felony or specifically enumerated misdemeanor for which the defendant was convicted and that any conditions otherwise required by the mandatory minimum sentencing provisions of Article 893.3 are shown to be applicable.
D. If at any time during or at the completion of the trial, the court finds by clear and convincing evidence that the state has established that a firearm was discharged or used during the commission of the felony or specifically enumerated misdemeanor or actually possessed during the commission of a felony which is a crime of violence as defined by R.S. 14:2(13), a felony theft, production, manufacturing, distribution, dispensing, *997 or possession with intent to produce, manufacture, distribute, or dispense a controlled dangerous substance in violation of the Uniform Controlled Dangerous Substances Law, or specifically enumerated misdemeanor, and that the mandatory minimum sentencing provisions of Article 893.3 have been shown to be applicable, the court may dispense with the hearing provided for in Paragraph A of this Article.
E. The motion shall be heard and disposed of prior to the imposition of sentence.
La.C.Cr.P. art. 893.3, the statute containing the actual mandatory minimum sentence provisions, states:
A. If the court finds by clear and convincing evidence that the offender actually possessed a firearm during the commission of the felony or specifically enumerated misdemeanor for which he was convicted, the court shall impose a term of imprisonment of two years; however, if the maximum sentence for the underlying offense is less than two years, the court shall impose the maximum sentence.
B. If the court finds by clear and convincing evidence that the offender actually used a firearm in the commission of the felony or specifically enumerated misdemeanor for which he was convicted, the court shall impose a term of imprisonment of five years; however, if the maximum sentence for the underlying offense is less than five years, the court shall impose the maximum sentence.
C. If the court finds by clear and convincing evidence that the offender actually discharged a firearm in the commission of the felony or specifically enumerated misdemeanor for which he was convicted, the court shall impose a term of imprisonment of ten years; however, if the maximum sentence for the underlying offense is less than ten years, the court shall impose the maximum sentence.
D. If the court finds by clear and convincing evidence that a firearm was actually used or discharged by the defendant during the commission of the felony for which he was convicted, and thereby caused bodily injury, the court shall impose a term of imprisonment of fifteen years; however, if the maximum sentence for the underlying felony is less than fifteen years, the court shall impose the maximum sentence.
E. (1)(a) Notwithstanding any other provision of law to the contrary, if the defendant commits a felony with a firearm as provided for in this Article, and the crime is considered a violent felony as defined in this Paragraph, the court shall impose a minimum term of imprisonment of ten years. In addition, if the firearm is discharged during the commission of such a violent felony, the court shall impose a minimum term of imprisonment of twenty years.
(b) A "violent felony" for the purposes of this Paragraph is: aggravated sexual battery, aggravated burglary, carjacking, armed robbery, second degree kidnapping, manslaughter, or forcible rape.
(2) A sentence imposed under this Paragraph shall be without benefit of parole, probation or suspension of sentence.
F. A sentence imposed under the provisions of this Article shall not be suspended and shall be imposed in the same manner as provided in the felony for which the defendant was convicted.
G. A defendant sentenced under the provisions of this Article shall not be eligible for parole during the period of the mandatory minimum sentence.

*998 H. If the court finds that a sentence imposed under provisions of this Article would be excessive, the court shall state for the record the reasons for such finding and shall impose the most severe sentence which is not excessive.
I. For the purpose of this Article, "firearm" is defined as an instrument used in the propulsion of shot, shell, or bullets by the action of gunpowder exploded within.
J. For purposes of this Article, the specifically enumerated misdemeanors to which these sentencing provisions are applicable shall be:
(1) R.S. 14:79, violation of a protective order, involving an assault or battery of the person protected.
(2) R.S. 14:67, theft.
(3) R.S. 14:35, simple battery.
(4) R.S. 14:37, aggravated assault.
(5) R.S. 14:40.2, stalking.
Defendant argues that La.C.Cr.P. art. 893.1 et seq. is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In Apprendi the defendant fired several shots into the home of a black family and made a statement that he did not want the family in his neighborhood because of their race. He was charged under New Jersey law with, among other violations, second-degree possession of a firearm for an unlawful purpose, which carried a prison term of five to ten years. The indictment did not refer to the state's hate crime statute, which provided for an enhanced sentence if a trial judge would find, by a preponderance of the evidence, that the defendant committed the crime with a purpose to intimidate a person or group because of, inter alia, race. After defendant pleaded guilty, the prosecutor filed a motion to enhance the sentence. The trial court found by a preponderance of the evidence that the shooting was racially motivated and sentenced the defendant to twelve years on the firearms count, two years more than the prescribed statutory maximum for that particular offense. The U.S. Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. at 2362-2363. The court found that the effect of the so-called sentencing "enhancement" provision "was unquestionably to turn a second-degree offense into a first degree offense" with a higher maximum than the offense for which the defendant was tried and convicted. 530 U.S. at 494, 120 S.Ct. at 2365.
In Harris v. U.S., 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), the U.S. Supreme Court held that a firearm sentencing scheme providing for a two-year increase in the minimum sentence based on a judicial finding of brandishing of a firearm was not unconstitutional, even in light of its decision in Apprendi. The federal statute in Harris, 18 U.S.C. § 924(c)(1)(A), provided in relevant part that:
[A]ny person who, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime
(i) be sentenced to a term of imprisonment of not less than 5 years;
(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.
*999 The government maintained that the statute charged a single crime and that brandishing of a firearm was a sentencing factor to be considered by the judge after the trial. Accordingly, the indictment made no mention of brandishing, but simply alleged the elements from the principal paragraphthat the defendant knowingly carried a firearm during and in relation to a drug trafficking offense. Following defendant's conviction for the offense, the court found by a preponderance of the evidence that the defendant brandished the firearm during the commission of the crime, and sentenced him to seven years in prison. The U.S. Supreme Court agreed with the government's position, and held that the provision of the statute calling for a higher minimum sentence for brandishing the firearm was not an element of an offense but was a sentence enhancement that did not increase the maximum penalty for the offense for which the defendant had been convicted by a jury.
The Harris court referred to the continuing viability of McMillan v. Pennsylvania, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), and distinguished its holding in McMillan from its holding in Apprendi. In McMillan, a Pennsylvania statute, the "Mandatory Minimum Sentencing Act," provided that any person convicted of an enumerated offense or an attempt to commit such offense while visibly possessing a firearm had to be sentenced to a minimum sentence of at least five years. All of the maximum sentences for the enumerated offenses were greater than five years. The statute provided that the sentencing enhancement was not an element of the crime charged, and that the trial court would determine the applicability of the enhancement section at sentencing, by a preponderance of the evidence. The U.S. Supreme Court upheld the constitutionality of the statute. In Apprendi, the U.S. Supreme Court distinguished McMillan in a footnote, noting its continuing viability and limitation to "cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict." 530 U.S. at 487, n. 13, 120 S.Ct. at 2361, n. 13. The court noted this distinction in Harris, thus reaffirming its holding in McMillan. 536 U.S. at 563, 122 S.Ct. at 2417.
Defendant cites State v. Palermo, 2000-2488 (La.5/31/02), 818 So.2d 745, where the Louisiana Supreme Court found the attempted arson statute, La. R.S. 14:54, unconstitutional as depriving a defendant of his due process right to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. Under La. R.S. 14:54, a jury would make the determination beyond a reasonable doubt whether the defendant attempted to commit arson. However, under the statute, the trial court would determine for sentencing purposes whether that attempt was to commit aggravated arson or simple arson. The instant case is clearly distinguishable from Palermo.
It is obvious that the trial court in the instant case misapplied La.C.Cr.P. art. 893.3 to sentence defendant to two additional years in prison, imposing a sentence separate and apart from and in addition to the sentences imposed upon defendant for the crimes for which he was convicted. La.C.Cr.P. art. 893.3 is nothing more than a sentencing enhancement statute that provides for the imposition of a mandatory minimum sentence for an offense for which the defendant has been convicted beyond a reasonable doubt, with such sentence not exceeding the maximum statutory sentence for that offense. The statutory scheme, providing for the determination of the statute's applicability by the trial *1000 court, not a jury, is entirely within the constitutional parameters set forth in McMillan and reaffirmed in Harris, and also in Apprendi by reference in a footnote.
The original firearms sentencing provision was added to the Code of Criminal Procedure by Acts 1981, No. 139, § 1. It provided:
When the court makes a finding that a firearm was used in the commission of a felony and when suspension of sentence is not otherwise prohibited, the court shall impose a sentence which is not less than:
(1) The maximum sentence provided by law, in the same manner as provided in the offense, if the maximum sentence is less than five years, or
(2) Five years, in the same manner as provided in the offense, if the maximum sentence is five years or more.
Imposition or execution of sentence shall not be suspended and the offender shall not be eligible for probation or parole.
This statute clearly provided for the imposition of a mandatory minimum sentence for the use of a firearm in the commission of a felony, not for the imposition of a separate sentence in addition to the sentence for the crime for which the defendant was convicted. La.C.Cr.P. art. 893.1 was amended and reenacted by Acts 1988, No. 319, § 1 to enact La.C.Cr.P. arts. 893.2, 893.3 and 893.4 "to provide for the imposition of minimum mandatory sentences in certain cases." La.C.Cr.P. art. 893.1 now simply sets forth the procedure the State follows if it intends to move for imposition of a mandatory minimum sentence under La.C.Cr.P. art. 893.3. There was no legislative intent expressed to change the existing law from merely providing for mandatory minimum sentences to providing for separate sentences in addition to the ones imposed for the crimes for which the defendant has been convicted.
That La.C.Cr.P. art. 893.3 merely provides for a mandatory minimum sentence is also evident by a reading of the language in the statutory scheme itself. La. C.Cr.P. art. 893.2 refers three times to "the mandatory minimum sentencing provisions of Article 893.3." La.C.Cr.P. art. 893.3(G) states that "[a] defendant sentenced under the provisions of this Article shall not be eligible for parole during the period of the mandatory minimum sentence." These references make it clear that the enhanced sentences provided by La.C.Cr.P. art. 893.3 are simply mandatory minimum sentences for the crimes for which the defendant has been convicted. The statute is written so that the mandatory minimum sentences provided therein will never exceed the maximum sentences for the offenses a defendant is convicted of beyond a reasonable doubt by a juryor a judge.
The mandatory minimum sentencing scheme provided by La.C.Cr.P. art. 893.1 et seq. is not unconstitutional under Apprendi or under any other jurisprudence cited by defendant. However, as noted, the trial court in this case erred in applying the statute so as to impose a separate two-year sentence upon defendant in addition to the sentences imposed for the crimes for which he was convicted.
There is no merit to defendant's argument that the evidence was insufficient to establish that he possessed a firearm during the commission of one of the eight felony offenses for which he was convicted. One victim, D.W., testified that defendant was in possession of a gun on both occasions when he raped her. Another victim, T.C., testified that defendant was in uniform and carrying a gun at the *1001 time of the crime. Her companion, Marvin Pepp, testified that defendant was wearing a gun belt at the time of the crime. Thomas Emory, who was with another victim, U.H., at the time defendant accosted them, testified that defendant was in uniform and carrying a gun at the time of the crime. However, the trial court did not specify which offense defendant was committing while in possession of a firearm. The trial court can do that on remand.
CONCLUSION
For the foregoing reasons, we affirm defendant's convictions and sentences imposed for those convictions. We order that the two-year sentence imposed upon defendant under La.C.Cr.P. art. 893.3 be vacated, and the matter be remanded for resentencing. We further order the trial court to specify the offense it finds defendant was in possession of a firearm during the commission thereof for purposes of imposing the mandatory minimum sentence under La.C.Cr.P. art. 893.3.
CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART, VACATED AND REMANDED IN PART.
NOTES
[1] See La.C.Cr.P. art. 893.1, et seq.
[2] In State v. Lee, 2000-2516 (La.App. 4 Cir. 4/6/01), 787 So.2d 1020, this court affirmed the trial court's November 17, 2000 finding of Lon Burns in contempt, but vacated the sentence imposed and remanded the matter for resentencing. On April 16, 2001, ADA Lon Burns was sentenced to six months for constructive contempt of court. This court denied ADA Burns' application for supervisory review and a stay in State v. Burns, XXXX-XXXX, unpub. (La.App. 4 Cir. 4/16/01), writ granted, XXXX-XXXX (La.6/1/01), 793 So.2d 172. The Louisiana Supreme Court stayed all contempt proceedings and ordered ADA Lon Burns released from custody pending disposition of his writ application. State v. Lee, XXXX-XXXX (La.4/16/01), 787 So.2d 276. In State v. Lee, 2001-10 (La.11/29/01), 800 So.2d 833, the Louisiana Supreme Court reversed ADA Lon Burns' conviction for constructive contempt on the ground of tampering with evidence, but affirmed his conviction for constructive contempt on the ground of willfully failing to timely disclose the discovery of inculpatory evidence. The court vacated the six-month sentence impose on Mr. Burns, instead, imposing a $500 fine on him.
[3] The initials of the victims will be used throughout the opinion. See La. R.S. 46:1844(W) (barring public disclosure of the names of crime victims under the age of eighteen years and of victims of sex offenses, and authorizing use of initials, abbreviations, etc.).
[4] The record spells the street name as Montigue; the correct spelling is Montegut.
[5] The State nolle prosequied the remaining charges in case # 410-779, reinstituting them in case #412-994, along with new charges.
[6] A court possesses inherently all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders, including authority to issue such writs and orders as may be necessary or proper in aid of its jurisdiction. It has the duty to require that criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done. A court has the power to punish for contempt.