MURRAY, Judge.
|! This is a criminal appeal. The sole issue presented is whether the sentence imposed on the defendant, Abraham Washington, pursuant to the firearm sentencing enhancement provision, La.C.Cr. P. art. 893.3, violated his Sixth Amendment right to a jury trial. Finding it did, we vacate the sentence and remand for re-sentencing.
STATEMENT OF THE CASE
On December 5, 2003, the State filed a bill of information charging Mr. Washington with aggravated battery and false imprisonment while armed with a dangerous weapon. On the day of his arraignment, January 14, 2004, the district court issued a “stay away” order, which Mr. Washington subsequently violated. On March 12, 2004, Mr. Washington was ordered to observe an 8:00 p.m. curfew and to serve ten weekends in Orleans Parish prison. At the hearing on motions scheduled for April 5, 2004, the defense waived motions. On August 2, 2004, the State filed a motion to invoke the firearm sentencing enhancement provision, La.C.Cr.P. art. 893.3, and a notice of intent to use Mr. Washington’s inculpatory statement, which was previously ruled inadmissible. On November 4, 2004, a six-person jury tried the case. The jury found Mr. Washington guilty of the responsive Lverdicts of second-degree battery and attempted false imprisonment while armed with a dangerous weapon.[1]
On December 9, 2004, the district court sentenced Mr. Washington to five years at hard labor on each count with the sentences to run concurrently and with the sentence for second-degree battery to be served without benefit of parole. On February 1, 2005, the trial court denied Mr. Washington’s motion for reconsideration of sentence, but granted his motion for appeal.
STATEMENT OF THE FACTS
On September 19, 2003, Mr. Washington and his estranged wife, Daneen Washington, were living separate and apart. After seventeen years of marriage, they were in *141 the process of getting a divorce. Mrs. Washington and the children were living in the family house located at 2643 Third Street. At about 7:30 a.m. that day, Mr. Washington came to the family house to take the children to school. He asked Mrs. Washington if he could return to the house after dropping the children off to pick up two bubble gum machines he needed for his vending business. She agreed.
When Mr. Washington returned, Mrs. Washington let him in the front door and turned to go to her bedroom. She assumed he was going to take his vending-machines and leave. Unbeknownst to her, he followed her into the bedroom and shut the door. Mr. Washington told her that they needed to talk. When she turned to look at him, he had a gun pointed in her face.
Mr. Washington was upset because he had overheard a message on Mrs. Washington’s cell phone from another man. He accused her of having an affair |sand hovered over her. Every time she tried to move, he hit her with a gun. He also choked her. Mrs. Washington’s hand was swollen from trying to block the blows from the gun. Mr. Washington also hit Mrs. Washington in the center of her head with the gun, and she fell face forward onto the bed. Mr. Washington told Mrs. Washington that he was going to kill her and then kill himself.
Mrs. Washington requested to go to the bathroom to get a towel for her head, which was bleeding. Mr. Washington pulled her by the shirt, took her into the bathroom, and threw her into the bathtub. She asked to use the toilet. He responded by pulling her from the bathtub and putting her on the toilet. Because she was weak from losing blood, Mrs. Washington fell from the toilet, hitting the wall and then the floor.
Mrs. Washington told Mr. Washington that if he was going to kill her to do it now, and she asked if. she could get in bed and cover herself. After she got in bed, Mr. Washington got on top of her. She flipped him, and they both fell on the floor. The gun accidentally fired. Neither of them was harmed. Mr. Washington then ran from the house. According to Mrs. Washington, the next thing she recalled was seeing her aunt, Shirley Jackson, standing in her house.
Shirley Jackson had gone for a walk that morning and stopped by her niece’s house. She knocked at the door, but no one answered. She then heard a gunshot. When she pushed open the door, Mr. Washington ran past her with a gun. She found her niece hysterical and bleeding from the head. Because Mrs. Washington could not locate her cell or portable phone, Shirley Jackson and Mrs. Washington went to the aunt’s house to call 911.
Both the police and emergency medical service responded to the call. Mrs. Washington was taken to the hospital where she was treated. She required stitches |4in her head. Mrs. Washington identified her voice on the tape recording of the 911 call that was played for the jury. She also identified pictures of her house that were taken after the incident. She denied hitting her head on any furniture.
New Orleans Police Officer Therence White, Jr., was the first officer to respond to the call. Officer White testified that he observed Mrs. Washington was bleeding from her head and had a swollen hand. He also observed that Mrs. Washington’s bedroom was ransacked and that the bedspread and bathroom wall had blood on them. Officer White obtained an arrest warrant for Mr. Washington.
Shortly thereafter, Mr. Washington turned himself in at the police station and was advised of his rights. He gave a *142 statement acknowledging that what he did was wrong, that he was sorry, and that he had lost control. Other than admitting that he had a gun, Mr. Washington did not tell the police anything in particular about his actions.
Officer White was also called by the defense as a witness to rebut Mrs. Washington’s testimony. Apparently, Officer White failed to include in his report that Mr. Washington’s vending machines were bubble gum machines and that Mrs. Washington told him that she was choked and repeatedly hit with a gun. In rebuttal, Officer White essentially corroborated Mrs. Washington’s testimony.
Adelaine Jackson, Mr. Washington’s sister, testified that she and Mrs. Washington were good friends. She accompanied Mrs. Washington’s mother to pick up Mrs. Washington from the hospital following the incident. She often talked to Mrs. Washington over the telephone. Mrs. Washington told her that she was hit in the head with the gun and that she tried to lure Mr. Washington from the bathroom into the bedroom by suggesting they make love. Mrs. Washington also |stoId her that she did not want to pursue the criminal charges against Mr. Washington, but the State was pursuing them anyway.
Mr. Washington testified in his defense. At the time of the incident, he was living with his mother. He and Mrs. Washington were separated because she was seeing a man from her work. According to Mr. Washington, on the day of the incident, he took his children to school and then returned to the family house to pick up his vending machines, which he had left there when he moved out of the house. After Mrs. Washington opened the door, he followed her back to her bedroom and politely told her that they needed to talk. He asked her about a message on- her cell phone. He explained that when he called her earlier from his work, he accidentally tapped her voicemail and retrieved the message. Mr. and Mrs. Washington simultaneously reached to grab for Mrs. Washington’s cell phone. They struggled over the phone. Mrs. Washington was able to get the phone from Mr. Washington. When she did, she fell backwards and hit her head on the dresser. She ran towards him. He grabbed her and threw her on the bed.
During the scuffle, Mr. Washington noticed that Mrs. Washington was bleeding. He went to the bathroom to get a towel. As Mr. Washington went towards the bathroom, Mrs. Washington reached under the mattress of the bed, removed a butcher knife, and came towards Mr. Washington. In response, Mr. Washington pulled a gun and told Mrs. Washington to drop the knife, which she did. Mr. Washington explained that Mrs. Washington had cut him once before with a knife during a disagreement and that he did not want to get cut again.[2]
|fiMr. Washington further testified that Mrs. Washington came into the bathroom by herself and sat on the toilet. He placed a towel on her head. They went into the bedroom and sat on the bed. Although she wanted to make love, he refused. After a few moments, she pushed him off the bed, and he landed on his back with the gun in his hand. She jumped on top of him and tried to grab the gun. The gun fired. After making sure Mrs. Washington was not shot, Mr. Washington walked out of the house. He stated that the doorbell never rang; rather, he opened the *143 door and found Mrs. Washington’s aunt standing outside. Mr. Washington testified that the door to the bedroom was always open. He stated that he did not know how the blood got on the bathroom wall. He denied putting Mrs. Washington into the bathtub, denied pointing the gun at her, and denied threatening to kill her.
ERRORS PATENT
Our review of the record for errors patent reveals one. The sentencing minute entry and commitment order reflect that Mr. Washington’s five-year sentence for attempted false imprisonment while armed with a dangerous weapon was imposed without benefit of parole. However, the sentencing transcript reflects that benefits were not restricted. The transcript controls. We thus order the district court on remand to issue a new commitment order to the Department of Corrections on this count.[3]
DISCUSSION
Mr. Washington frames the issue as whether the trial court’s imposition of a sentence of five years without parole eligibility pursuant to the firearm sentencing 17enhancement provision, La.C.Cr.P. art. 893.3, for his conviction of second degree battery violated his Sixth Amendment right to a jury trial. Under La. R.S. 14:34.1, the statutory maximum for second degree battery is five years at hard labor with no limit on parole eligibility.[4] The trial court, however, sentenced Mr. Washington to five years without benefit of parole pursuant to the firearm sentencing enhancement provision, La.C.Cr.P. art. 893.3(B) and (G). Article 893.3(B) provides:
If the court finds by clear and convincing evidence that the offender actually used a firearm in the commission of the felony or specifically enumerated misdemeanor for which he was convicted, the court shall impose a term of imprisonment of five years; however, if the maximum sentence for the underlying offense is less than five years, the court shall impose the maximum sentence.
La.C.Cr.P. art. 893.3(B). Article 893.3(G) provides that “[a] defendant sentenced under the provisions of this Article shall not be eligible for parole during the period of the mandatory minimum sentence.” La. C.Cr.P. art. 893.3(G).
Because the trial court, not the jury, found Mr. Washington used a firearm in the commission of the battery in question and because the trial court thus imposed a more severe sentence than statutorily allowed for the underlying offense, Mr. Washington argues that his right to a jury trial was violated.[5] In support, he cites Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Those cases hold that “[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the pre *144 scribed statutory maximum must |sbe submitted to a jury, and proved beyond a reasonable doubt.” Apprendi, 530 U.S. at 490, 120 S.Ct. at 2362-63.[6]
Mr. Washington’s argument is based on the straightforward premise that a mandatory minimum five year sentence without parole eligibility' — the sentence imposed pursuant to the firearm sentencing enhancement provision — is a more severe sentence than a five year sentence with no restriction on parole eligibility- — the maximum sentence for second degree battery, the crime for which he was convicted. Mr. Washington contends that the imposition of the more severe sentence — the addition of a limitation on parole eligibility — that resulted from the trial court’s factual finding that he committed the second degree battery with a firearm resulted in a violation of his right to a jury trial under Apprendi
Conversely, the State contends that there was no Apprendi violation. In support, the State cites State v. Lee, 2002-1793 (La.App. 4 Cir. 4/02/03), 844 So.2d 970, writ denied, 2003-1247 (La.10/10/03), 855 So.2d 330, in which this court found the firearm sentencing enhancement provision constitutional under Apprendi. We find the State’s reliance on Lee misplaced, factually and legally.
Legally, our discussion in Lee of the firearm sentencing enhancement provision was dicta. The Apprendi violation raised in Lee was the result of the trial court’s misconstruing La.C.Cr.P. art. 893.3 as authorizing the imposition of an additional sentence on top of the sentence imposed for the underlying crime. We found the resulting sentence the trial court imposed to be an error patent. Although we recognized that our finding of an error patent rendered moot the issue of whether the firearm sentencing enhancement provision codified in La.C.Cr.P. art. |fl893.1, et seq., is unconstitutional under Apprendi, we nonetheless opted to address the issue “because on remand defendant may be re-sentenced under La.C.Cr.P. art. 893.3.” Lee, 2002-1793 at p. 40, 844 So.2d at 995.
In discussing the Apprendi issue, we found that Article 893.3 merely provides for the imposition of a mandatory minimum sentence when a firearm is used in the commission of a felony; it does not provide for a separate sentence in addition to the sentence imposed for the underlying crime for which the defendant is convicted. In so finding, we emphasized the repeated use in the firearm sentencing enhancement provision of the phrase “mandatory minimum sentence.” In this connection, we noted as illustrative the reference to that phrase in Article 893.3(G), which provides that “[a] defendant sentenced under the provisions of this Article shall not be eligible for parole during the period of the mandatory minimum sentence.” Lee, 2002-1793 at p. 49, 844 So.2d at 1000 (quoting La.C.Cr.P. art. 893.3(G)(emphasis supplied)). Continuing, we concluded that “[tjhese references make it clear that the enhanced sentences provided by La. C.Cr.P. art. 893.3 are simply mandatory minimum sentences for the crimes for which the defendant has been convicted.” Id. Finally, we stated that “[t]he statute is written so that the mandatory minimum sentences provided therein will never exceed the maximum sentences for the offenses a defendant is convicted of beyond a reasonable doubt by a jury — or a judge.” Id. (emphasis supplied). Based on this reasoning, we held that the mandatory *145 minimum sentencing scheme codified in La.C.Cr.P. art. 893.1, et seq., is constitutional under Apprendi Id.
Factually, this case illustrates a scenario not contemplated by our discussion in Lee. Here, the mandatory minimum sentence dictated by the application of the firearm sentencing enhancement provision exceeds the maximum sentence for the Imcrime of second degree battery for which Mr. Washington was convicted by the jury. As noted, the sentence imposed is more severe due to the parole eligibility restriction. For that reason, the enhanced sentence in this case presents an Apprendi violation; to-wit: the trial court made a factual finding—that Mr. Washington used a firearm in committing the offense—that resulted in a more severe sentence than the jury’s findings alone would have permitted. That sentence is therefore constitutionally infirm. We thus vacate the sentence.

DECREE

For the foregoing reasons, the defendant’s convictions are affirmed. The defendant’s sentence on the second degree battery count is vacated, and this matter is remanded for re-sentencing on that count consistent with this opinion. Defendant’s sentence on the attempted false imprisonment count is affirmed, but the district court is ordered to issue a new commitment order consistent with this opinion.
CONVICTIONS AFFIRMED, SENTENCES VACATED IN PART, AND REMANDED FOR RE-SENTENCING

. The minute entry incorrectly indicates that Mr. Washington was found guilty as charged.

. Mrs. Washington admitted cutting her husband with a knife on an earlier occasion. As a result of that earlier incident, she was convicted of domestic abuse and was sentenced to attend anger management classes.

. As noted elsewhere, another error in the record is that the minute entry erroneously reflects that Mr. Washington was convicted as charged. However, the record clearly reflects that the jury found him guilty of the responsive verdicts of second degree battery and attempted false imprisonment while armed with a dangerous weapon.

. La. R.S. 14:34.1 provides: "[wjhoever commits the crime of second degree battery shall be fined not more than two thousand dollars or imprisoned, with or without hard labor, for not more than five years, or both.”

.At trial, defense counsel requested the jury be instructed on the firearm sentencing enhancement provision, La.C.Cr.P. art. 893.3, but the trial court denied the request, noting this was not a decision for the jury to make.

. In.Blakely, the Supreme Court extended the scope of Apprendi to include sentences that exceed the presumptive sentencing range set by a state's sentencing guideline scheme for the crime in question.